`            IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
                                AT JACKSON
                           January 11, 2005 Session

          STATE OF TENNESSEE v. ROBERT LEONARD MOSLEY

             Direct Appeal from the Circuit Court for Henry County
                 No. 13474     C. Creed McGinley, Judge

                        _____

             No. W2004-00228-CCA-R3-CD  - Filed April 19, 2005
                        _____

On appeal, the defendant challenges:  (1) the sufficiency of the evidence; (2) the sentence imposed,
in light of Blakely v. Washington; and (3) the denial of alternative sentencing.  Following our
review, we conclude that there was sufficient evidence presented, such that a reasonable jury could
reject the theory of diminished capacity and find the defendant guilty of the convicted offenses.
Further, it appears that the enhancement factors were applied errantly in light of Blakely.  Therefore,
we reduce the sentence to the presumptive minimum and remand the matter for a determination of
the defendant's suitability for alternative sentencing.

      Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed as
                              Modified; Remanded

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which J. C. MCLIN, J., joined.
DAVID G. HAYES filed a separate opinion, dissenting with regard to sentence modification.

Terry J. Leonard, Camden, Tennessee, for the appellant, Robert Leonard Mosley.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; G.
Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney
General, for the appellee, State of Tennessee.

                                 OPINION

                          Facts and Procedural History

      On March 3, 2003, the Henry County Grand Jury returned a three-count indictment charging
the defendant, Robert Leonard Mosley, with attempted first degree murder (a Class A felony),
aggravated burglary (a Class C felony), and aggravated assault (a Class C felony).  Following a jury
trial on July 21, 2003, the defendant was convicted of the lesser included offense of attempted

second degree murder (a Class B felony) and aggravated assault.[1]  Upon finding two enhancing factors and no mitigating factors applicable, the defendant was sentenced, as a Range I, standard offender, to ten years for attempted second degree murder and four years for aggravated assault.  The sentences were ordered to be served concurrently, for a total effective sentence of ten years.

On September 19, 2003, the defendant filed a motion for new trial, which was denied by the trial court three days later.  The defendant now appeals to this Court challenging:  (1) the sufficiency of the evidence to support the verdict; (2) the sentence imposed, in light of the Supreme Court's recent holding in Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004); and (3) the denial of alternative sentencing.

The record reflects a lengthy and somewhat tumultuous history between the defendant and the victim, who were married for approximately twelve years and had been divorced for just over a month at the time of the subject incident.  At trial, the victim related the events leading up to the encounter that is the subject of this appeal.  She testified that, following her divorce from the defendant on August 5, 2002, she went to the couple's former residence to retrieve some personal belongings.  While there, the defendant threatened the victim by saying that "[he] could kill [her]" and attempted to prevent her from leaving.  The victim indicated that the two argued for some time, but she was eventually able to escape the house.  She obtained an order of protection against the defendant the following day.

On September 1, 2002, the victim agreed to meet the defendant for the purpose of allowing the defendant to see their daughter ("Angela") before she returned to the Nashville School for the Blind, where she was a student.[2]  During this encounter, the defendant referenced a song by the musical group the *Dixie Chicks*, stating, "Just like Earl . . . Earl walked right through that restraining order.  That is how good that piece of paper is."  The victim testified that the defendant made this statement in the presence of both the victim's mother and Angela.

On September 14, 2002, the victim testified that she was awakened by a telephone call from the defendant at approximately 3:30 a.m.  Although she was unable to pick up the phone in time, she did listen to the message left by the defendant, which stated that the victim should return his call immediately.  Upon so doing, the victim learned that the defendant was upset at being omitted from the visitation list at Angela's school, which would result in his being unable to attend her track meet as he had planned.  The victim assured the defendant that it was a misunderstanding and that she would call the school the following morning to "get it straightened out."  The defendant thanked her, and she went back to sleep.

However, at approximately 4:30 a.m., the victim was awakened a second time by a knock at the door.  She approached the door and recognized the defendant, who stated that he "just want[ed] to talk."  The victim attempted to stall the defendant and dial 911 but, after receiving no

---

[1] The record reflects that the State *nolle prosequied* the charge of aggravated burglary.

[2] The record reflects that the defendant adopted Angela, formerly his stepdaughter, and that she bore his last name.

answer, she hung up. The defendant then said, "Do you think this door is going to stop me?" As the victim attempted to dial 911 a second time, the defendant broke through the glass with a gun and pointed it at the victim. As the victim ran in an attempt to escape, she heard the first gunshot. She continued to run towards the back of the house, exited through the back door, jumped off of the deck, and fell to the ground. The victim testified that, as she looked back towards the defendant, she heard a second shot.

After the second shot, the victim got up and attempted to hide from the defendant. In the meantime, she could hear the defendant yelling, "Where are you bitch?" The victim was able to move to the front porch of a neighbor's house where she attempted, unsuccessfully, to gain the neighbor's attention without revealing her location to the defendant. Shortly thereafter, an officer pulled into the victim's driveway and she ran to him, explaining what had transpired. The victim identified the defendant as he walked down the road and pointed him out to the responding officer. She later discovered that she had broken a bone in her left foot during the incident.

The victim testified that she did not deprive the defendant of the right to visit Angela and that she never stated that her current boyfriend would be taking the defendant's place as a father figure to Angela.

On cross-examination, the victim testified that she and the defendant were married for twelve years and that he was the only father that Angela had ever known. She stated that the three of them had previously lived in North Carolina, but the defendant eventually moved her and Angela to Henry County so that Angela could attend the Nashville School for the Blind. The victim testified that the defendant was an alcoholic and that he began consuming increasing amounts of alcohol while living alone in North Carolina. She admitted removing the defendant's name from Angela's school visitation list in March 2002, but stated that she put it back on the list immediately, in time for the defendant to attend at least a portion of a father-daughter dance at Angela's school.

The victim further admitted that she met her boyfriend, David Paschall ("Paschall"), in December 2000, but did not "get serious with him" until February 2001. She further stated that she told the defendant that she wanted a divorce in August 2001. The victim also acknowledged that the initial shot was not fired towards her heart, but was approximately an inch below the top of the pants. Regarding the second shot, she admitted that she did not know where the gun was pointed or how it discharged. Finally, the victim acknowledged that neither bullet touched her, that the defendant only shot twice, and that only one of the shots was fired while she was outside.

Officer David Walker Powell ("Officer Powell") then testified that he was employed with the Henry County Sheriff's Department and that he served the order of protection on the defendant following the encounter in August 2002. He stated that he personally advised the defendant to stay away from the victim and instructed the dispatcher to increase patrol around both residences. Officer Powell testified that he also responded to the subject incident and that he aided in gathering evidence, taking statements, and retrieving the weapon and ammunition. He stated that the defendant admitted at the scene that he recalled being served with the order of protection.

On cross-examination, Officer Powell acknowledged that the gun was only fired twice, leaving four rounds unfired, and that some of the ammunition found was "bird shot." He also testified that he advised the defendant that he was being arrested for aggravated domestic assault and a violation of the order of protection. Officer Powell stated that he believeed the defendant was impaired at the time of the incident.

Next, Angela Mosley testified that she was the daughter of the victim and the stepdaughter of the defendant. She further stated that, in August 2002, while waiting at the bus stop, the defendant referenced a song by the *Dixie Chicks*, stating, "[T]here was a lot of right in the song. Earl walked through that restraining order and that's how good that paper felt."

On cross-examination, Angela stated that she was familiar with the song and the fact that Earl eventually dies in it. She acknowledged that the defendant rented facilities with swimming pools so that she and the defendant could swim. She further acknowledged that the defendant moved her and her mother from North Carolina in 1998 so that she could go to school in Nashville.

Officer Bruce Alexander ("Officer Alexander") then testified that he was a patrol officer with the Henry County Sheriff's Department and that he responded to the victim's home based on back-to-back 911 hang up calls. He stated that, when he arrived, the victim ran up to the car frantically, stating that her ex-husband had a gun and was trying to kill her. The victim also told Officer Alexander that the vehicle in the driveway belonged to the defendant. As Officer Alexander called in the North Carolina license plate number, the victim identified the defendant, who was walking up the road.

Officer Alexander testified that he ordered the defendant to the ground and was, at that time, advised by radio of a possible order of protection between someone from North Carolina and someone living at that address. Officer Alexander asked the defendant if there was an order of protection against him, to which the defendant responded, "Look, man I'm not here to kill her. I'm here to kill the son of a bitch that she's living with." The defendant was eventually handcuffed and transported to the jail by another officer.

On cross-examination, Officer Alexander acknowledged that he did not know what caused the gun to fire as it went through the glass door. He also stated that the defendant made no attempt to escape or to hide the vehicle or the gun. Finally, Officer Alexander testified that he noticed the defendant's speech was slurred and believed the defendant was impaired. For this reason, he felt that the defendant should be transported to the hospital for a blood-alcohol test.

Officer Billy Smith ("Officer Smith") testified that he advised the defendant of his <u>Miranda</u> rights at the scene and that the defendant acknowledged that he understood them. Officer Smith testified that, after this acknowledgment, "the defendant told us that he didn't come here to kill his wife – or to hurt his wife. He came here to shoot I believe his name was Mr. Paschall in the balls." Officer Smith testified that the defendant did not make any statements about his daughter or being distraught or depressed that he could not visit Angela. On cross-examination, Officer Smith

admitted that he did not question the defendant about Angela or whether Paschall had been put on the pick-up list for Angela's school. He also acknowledged that the defendant stated that he did not intend to hurt the victim.

The next witness was Officer John Wesley Bradley ("Officer Bradley"). He stated that, when he arrived on the scene, the defendant was handcuffed and lying face down. Officer Bradley testified that the defendant stated, "I guess I'm in big trouble now. I didn't mean to hurt anybody." The defendant further stated, "I didn't come here to hurt my wife. I came here to kill – I mean shoot David Paschall." When Officer Bradley inquired further as to why he wanted to shoot Paschall, the defendant replied, "because he has been f--king my wife for nine months. I called the Sheriff's Department and asked and they said that was not against the law. I wasn't going to kill him; I just wanted to shoot him in the balls and I will tell anyone that." The defendant repeated these sentiments to Officer Bradley on the ride to the jail and while being booked.

After booking the defendant, Officer Bradley was asked to transport him to the Henry County Medical Center, which he did. While waiting at the hospital, the defendant told Officer Bradley that his gun was "too small" and that he "would have used a bigger gun but [he] got rid of [his] gun." Upon Officer Bradley's further inquiry, the defendant stated that "it was a .44 magnum with a 10-inch barrel" and that he "could hit a man at 100 yards with that." After the defendant's tests were completed, Officer Bradley transported him back to the Henry County Correctional Facility.

On cross-examination, Officer Bradley acknowledged that the defendant did not have an attorney present when he made the aforementioned statements. He further reiterated that the defendant said that he did not intend to hurt anyone.

Investigator Gary Wayne Vandiver ("Investigator Vandiver") testified that he went to the victim's house the day after the incident to conduct an interview with her and to photograph the scene and her injuries. Additionally, Investigator Vandiver spoke with the defendant twenty-four hours after he was taken into custody.

He testified that the defendant stated that he did not know why he went to the victim's house because "he was too drunk." When Investigator Vandiver inquired as to why the defendant took a gun to the victim's residence, the defendant replied that he supposed it was for the victim's boyfriend, but he did not think he was going to use it. When asked why he shot the gun, the defendant replied, "she must have pissed me off when she shut the door in my face." Finally, Investigator Vandiver asked the defendant if he was mad at the victim about something, to which the defendant replied that she had failed to help with financial matters as she had promised and had moved some of Angela's belongings out of the house.

On cross-examination, Investigator Vandiver acknowledged that the defendant neither had an attorney present at the time of the interview nor had he spoken with or seen an attorney at that time. He further acknowledged that the defendant asked for an attorney twenty minutes after the interview was concluded. Investigator Vandiver testified that the defendant stated that he carried

the gun for the victim's boyfriend, did not remember shooting the gun, and did not intend to hurt the victim. He further admitted that he never retrieved a bullet from the wall but merely measured the hole and noted that it appeared to be a bullet hole, based upon his experience. Finally, he stated that he had no personal knowledge of who put the hole in the wall or when it was put there.

The State's final witness, Lisa Ellison ("Ellison"), testified that she had an insurance company in Henry County and had occasion to speak with the defendant shortly after the subject incident. Ellison stated that the defendant called to inquire as to why his homeowner's insurance was being terminated, to which Ellison responded that he was too high a risk based upon the allegations against him regarding the attempted threat on the victim, his ex-wife. Ellison stated that the defendant, in turn, responded by saying "she deserved it." On cross-examination, Ellison acknowledged that the defendant called back some time later to state that he understood the reason for the termination of his policy.

The defendant then testified that he married the victim in 1990, and lived with her and her daughter Angela for eight years in North Carolina before moving back to Tennessee so Angela could attend the Nashville School for the Blind. Unable to find steady work in the Henry County area, the defendant continued to make his primary residence in North Carolina, while traveling back and forth every three to six weeks to visit in Tennessee. The defendant testified that he spoke with his wife and Angela twice a day while residing in North Carolina.

The defendant further testified that, although he had struggled with alcoholism and depression for some time, those problems were exacerbated by living alone in North Carolina, unsure of whether he would ever be able to find enough work to move to Tennessee with his family. Moreover, the defendant suspected that his wife was having a relationship with Paschall in December 2001, a suspicion which was confirmed by the victim a month later.

In the meantime, the defendant continued to grow closer to Angela, who was accepted and excelled in Nashville. Although the defendant and the victim separated, the defendant remained in close contact with Angela and continued to come to Tennessee to visit her.

On one occasion, the defendant stated that he flew into Nashville to attend a father-daughter dance with Angela at her school. After approximately thirty to forty minutes, a lady approached the defendant and inquired whether he was Angela's real father or her stepfather, because one of the two was not supposed to be on school grounds as per her mother's instructions. When the defendant responded that he was Angela's stepfather, security was called and the defendant and Angela voluntarily went to the car. The defendant then contacted the victim by phone, and she put the defendant's name back on the visitation list in time for the two to attend the remainder of the dance. The defendant stated that he never knew why his name was taken off of the list.

Upon returning to Tennessee in August, the defendant learned that Paschall would be picking Angela up from the bus stop. He stated that it "broke [his] heart" that someone else would be picking his daughter up.

The defendant further testified that the alleged threat to kill the victim in August 2002 was taken "out of context." He stated that he wanted the victim to calm down before she left but that he did not physically threaten her. Moreover, the defendant stated that the victim took some of Angela's belongings from his house that day, showing that "she was trying to eliminate [Angela] from [him] a little bit." Regarding the reference to the *Dixie Chicks* song, the defendant admitted that he spoke of it, but stated that he was trying to explain that "they killed [Earl and], they mentally killed me. They physically killed him. They were mentally killing me."

The defendant stated that around that time he learned of a track meet Angela would be participating in and postponed his trip back to North Carolina in order to attend the meet. On the week of the meet, the defendant learned from Angela that his name might not be on the visitation list. It was at this time that the defendant called the victim and left a message expressing his concern about the list. The defendant stated that he had consumed some alcohol and did not remember anything from the time of his phone message to the victim until he was standing in the victim's backyard. The defendant testified that he did not remember driving to the victim's home or his reason for traveling there. He further stated that he did not remember making any statements at the scene to Officer Bradley. The defendant also testified that he did not plan to shoot the victim.

On cross-examination, the defendant stated that, on the day of the subject incident, he consumed five or six beers around lunchtime and "a lot" of beer after 6 p.m. The defendant further defined "a lot" as twelve or more beers. Additionally, he stated that he took one or two pain pills, which had been prescribed for an extracted tooth, and snorted powder cocaine. He testified that he voluntarily consumed all three substances. He acknowledged that he knew of the order of protection and its scope and that he "believed" he remembered telling the responding officers he was aware of the order of protection. He further stated that he "possibly" remembered speaking with the officers about the seriousness of the situation. Regarding the conversation with Officer Bradley at the hospital, the defendant stated that he said, "[I]f I had the .22, that that wouldn't kill anybody. If I was planning on killing someone I would have brought a bigger gun." When asked about the comment to Ellison, he stated that he "[didn't] believe those were the exact words. [Ellison] had me highly excited." Finally, he acknowledged that the victim had rectified the previous problem with the visitation list at the father-daughter dance.

As the final witness, Dr. Gerald Monet ("Dr. Monet"), a licensed psychiatrist practicing in Henry County, testified. Dr. Monet stated that he met with the defendant on January 9, 2003, and on July 10, 2003, to perform a psychiatric assessment, a forensic evaluation, and to determine the state of mind of the defendant at the time of the offense. He stated that, in making his assessment, he considered the defendant's work history, family history, separation and divorce history, and the circumstances on or about the time of the incident.

Dr. Monet testified that he administered The Validity Indicator Profile (VIP), which is used to detect malingering, or lying to make oneself look unintelligent, disoriented, or ill. The defendant's results on that test showed that he was valid and compliant. Dr. Monet further stated that the defendant's separation history indicated that he perceived that the victim was "trying to

persecute [the defendant] through cutting off his relationship from Angela." He also stated that the defendant worked to provide for his family, even through financial hardships, and that the defendant had "a particular devotion" to Angela. Regarding the defendant's employment history, Dr. Monet stated that his references were highly complimentary and attested to his devotion to Angela.

As to the defendant's mental state at the time of the incident, Dr. Monet stated that the defendant's blood alcohol content (BAC) registered a .22, or 220 milligrams per deciliter. He further opined that this level "constitutes brain poisoning, what we call acute alcohol intoxication or severe drunkenness." Dr. Monet further noted that, because the sample was taken approximately two hours after the incident, the defendant's blood alcohol level was probably higher at the victim's house, extrapolating that the BAC would have been approximately .30 at that time.

Doctor Monet went on to explain the inherent danger in mixing cocaine and alcohol, stating that it can either "kill you or drive you mad depending on the concentration." Dr. Monet stated that, in the present case, only trace amounts of the cocaine/alcohol derivative (coca ethylene) were present, if at all, when the defendant's blood sample was taken.[3]

Dr. Monet concluded "that any aggressive act having occurred during the hours of September 14th were the products of a mental defect or disease suffered by [the defendant]." He further stated that the defendant suffered from a "definite comorbid state of severe intoxication" and that he "could not have knowingly and intentionally caused harm."

Upon the conclusion of the presentation of proof, the jury was charged with instructions on both voluntary intoxication and diminished capacity. After deliberating, the jury returned a verdict of not guilty of the indicted offense of criminal attempt to commit first degree murder and verdicts of guilty for both criminal attempt to commit second degree murder and aggravated assault.

Analysis

I. Sufficiency

Initially, the defendant contends that the evidence was insufficient to support the convictions. Specifically, he contends that he was suffering from diminished capacity, such that he could not appreciate the wrongfulness of his actions. In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences that may be drawn therefrom. Id. This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the defendant demonstrates that the facts contained in the record and the inferences that may be drawn therefrom are insufficient, as a matter of law, for a rational trier of fact

---

[3] The lab reports indicated that if coca ethylene was present in the defendant's blood, it constituted less than .25 micrograms per cc.

to find the accused guilty beyond a reasonable doubt.  State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

Accordingly, it is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt.  Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

Second degree murder is defined, in pertinent part, as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2004).  Moreover, the inchoate offense of attempt is codified at Tennessee Code Annotated section 39-12-101 and states,

> (a)    A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>    (1)    Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>    (2)    Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>    (3)    Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2004). Therefore, attempted second degree murder requires proof of: (1) a knowing, (2) attempt, (3) to kill another.  State v. Rush, 50 S.W.3d 424, 430 (Tenn. 2001) (citations omitted).

Further, aggravated assault is codified at Tennessee Code Annotated section 39-13-102 and states in pertinent part:

> A person commits aggravated assault who, after having been enjoined or restrained by an order, diversion or probation agreement of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual or individuals, intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against such individual or individuals.

Tenn. Code Ann. § 39-13-102(c) (2004).

Finally, an accused may present evidence of his diminished capacity to "negate the existence of the culpable mental state required to establish the criminal offense."  State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997).

On appeal, the defendant asserts that the evidence does not support his convictions, but rather supports his assertion that he could not appreciate the wrongfulness of his actions.  The defendant

bases the argument primarily on the testimony of Dr. Monet, a licensed psychiatrist and a witness for the defense. However, taken in a light most favorable to the State, the record reflects that there was ample evidence from which a jury could conclude that the defendant, though intoxicated, acted knowingly and with an appreciation for the seriousness his actions.

The victim testified that, almost a month before the subject incident, she had to obtain an order of protection after the defendant threatened her as she attempted to retrieve belongings from the couple's former residence. Further, both the victim and Angela testified that the defendant, referencing a song, stated that, "Earl walked right through that restraining order.

Two weeks later, the defendant phoned the victim at 3:30 a.m., concerned that he had been omitted from the visitation list at Angela's school. The two spoke, and the victim assured the defendant that the situation would be "straighten[ed] out" the following day. Despite this assurance, the defendant arrived at the victim's door one hour later, armed with a .22 caliber weapon. After the victim refused to admit the defendant into the house, he broke the glass with the gun and proceeded to fire two shots as the victim attempted to escape her home. Based upon consecutive 911 hang-up calls, an officer with the Henry County Sheriff's Department responded to the victim's address. The victim ran to the officer, communicated what had transpired, and identified the defendant as he walked up the road. She later discovered that she had sustained a broken bone in her foot as a result of the incident.

While at the scene, the defendant made several remarks that indicated his intent and an understanding of the seriousness of his actions. Officer Alexander, the first to arrive on the scene, testified that the defendant said, "Look, man I'm not here to kill her. I'm here to kill the son of a bitch that she's living with." Officer Bradley testified that the defendant said, "I guess I'm in big trouble now. I didn't mean to hurt anybody." He further stated, "I didn't come here to hurt my wife. I came here to kill – I mean shoot David Paschall." Finally, Officer Bradley testified that, while at the hospital with the defendant , the defendant stated that his gun was "too small" and that he would have used a bigger gun but [he] got rid of [his] gun."

Investigator Vandiver testified that he asked why the defendant shot the gun, to which he replied, "she must have pissed me off when she shut the door in my face." The defendant further indicated animosity at the victim over financial matters and the fact that she removed some of Angela's belongings from the house. Finally, Lisa Ellison testified that, during her conversation with the defendant regarding the allegations against him, he stated that "[the victim] deserved it."

Although Dr. Monet presented evidence supporting the theory of diminished capacity, virtually every other witness refuted that position. It is certainly the province of the jury to determine the credibility of witnesses, hear and weigh the evidence, and resolve all factual issues. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). In determining the defendant's mental state, the jury can consider both lay and expert testimony. State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citations omitted). Further, the weight and value given to expert testimony is a question of fact for the jury. Id. Upon our review, we conclude that there was sufficient evidence presented, such that a

reasonable jury could reject the theory of diminished capacity and find the defendant guilty of the convicted offenses. Therefore, the convictions are affirmed.

## II. Sentencing

The defendant also challenges the sentences imposed in light of the Supreme Court's recent holding in Blakely v. Washington. Blakely requires that enhancement factors be either admitted by the defendant or found by a jury determination beyond a reasonable doubt. Blakely, 124 S. Ct. at 2537. An exception to this rule is that state law may authorize a trial judge to increase a sentence beyond the maximum based upon "the fact of a prior conviction." Id. at 2536. On appeal, the defendant contends that his sentences were issued in error, as the enhancement factors applied met neither Blakely requirement.

In the present case, the defendant was convicted of attempted second degree murder, a Class B felony, which carries a Range I penalty of between eight and twelve years; and aggravated assault, a Class C felony, which carries a Range I penalty of between three and six years. The trial court began with the presumptive sentence, the minimum in the range, and found two enhancement factors applicable: (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (10) the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114 (2004). Based upon these findings, the defendant's attempted second degree murder sentence was enhanced to ten years, and his aggravated assault sentence was enhanced to four years. The sentences were ordered to be served concurrently, for a total effective sentence of ten years.

Turning first to factor (2), we mention that the trial court noted three facts in applying this factor. First, the court noted that the defendant had two self-reported DUI's; however, the court opined that, because they were both remote in time and self-reported, "the Court [would] not give [them] great weight." Secondly, the trial court noted "other charges" which were reported from the National Crime Information Center (NCIC), but stated that, because the dispositions were unknown, the court "couldn't consider them." Finally, the trial court noted that the defendant,

> was engaged in an around the time of the commission of this criminal act in the use of a class – I beg your pardon, a Scheduled [sic] two controlled substance, cocaine, as well as excessive use of alcohol and they would constitute criminal behavior in addition to those necessary to establish the range and it does carry substantial weight with this Court.

We conclude that, because the application of enhancement factor (2) was based on prior criminal behavior rather than prior criminal convictions, Blakely would require either an admission

or a jury determination of these facts prior to utilizing them as a basis for enhancement.[4] As neither requirement was fulfilled, factor (2) was errantly applied.

Likewise, we conclude that the application of enhancement factor (10) was in error as it was neither admitted by the defendant nor found by a jury determination beyond a reasonable doubt, as Blakely requires. Therefore, because both factors were applied in violation of Blakely, the defendant's sentences must be reduced to their presumptive minimums, or eight and three years, respectively.

Finally, the defendant challenges the denial of alternative sentencing. We note that the reduction in the defendant's sentences, based upon Blakely violations, renders him statutorily eligible for probation where he previously was not. Tenn. Code Ann. § 40-35-303(a) (2004). Therefore, we remand the matter for the sole purpose of determining the defendant's suitability for alternative sentencing.

Conclusion

The defendant's convictions are affirmed. However, we reduce the sentences from ten to eight years for attempted second degree murder, and four to three years for aggravated assault, based upon Blakely violations. The matter is remanded for a determination of the defendant's suitability for alternative sentencing.

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[4] Although the defendant admitted this behavior at trial, this Court has previously held that an "admission," for purposes of Blakely, refers to facts admitted "in relation to a guilty plea or during a plea colloquy." State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 1053, at *59 (Tenn. Crim. App., at Nashville, Nov. 30, 2004).